Our next case is We-LAN v. Apple, Inc. We-LAN, Inc. v. Apple, Inc. As a preliminary matter, we received a request this morning to extend the time for oral argument and the court has conferred on the request and we've determined to deny the request. So each side is going to have 15 minutes to argue this for you. Mr. Cote, is that correct? Mr. Cote, yes. Cote, yes sir. Are you ready? Yes, Your Honor. You're reserving five minutes for rebuttal time, correct? Correct, Your Honor. So it's Robert Cote for Appellant We-LAN. May it please the court. The district court below... Mr. Cote, let me throw three questions at you, but I look at it as one, okay? So, one, where does the patent mention complex multiplier? Where is it in the district court's original construction? And was that phrase raised in connection with the jury's instructions? So they're all complex multiplier questions. Correct. So if you look at the corresponding structure identified by the court, you'll see that both figures one and four are identified along with citations to the specification. If you look at those citations, you'll find that there's a reference to the figure four description, would be column two, lines 58 to 62 of the patent. At column two, lines 58 to 62 of the patent, it actually identifies that the figure three transforms should be included as part of the corresponding structure. And you'll recall in figure four that we're talking about a multi-stage transform structure, and it just calls those endpoint transforms. To understand what those endpoint transforms are, the description of figure four, again, at column two, lines 58 to 62, tells you that those transforms include the transforms in figure three. And the patent will teach you at column four, lines 66 to column five, line 12, each of the transforms that you may use, Each of the transforms, with the exception of one, the randomizer transform, is a multi-code transform that will do the multi-code spreading, which is the key to the invention. Turn a single-lane highway into a multi-lane freeway by using these multi-code spreading transforms. Those are all orthogonal transforms that allow the lanes not to interfere with each other, so that on the other end, you get back the data that was in each of the highway lanes. So the essence of the invention is multi-code spreading. And then the other essence of the invention is if I want to combine these signals and actually replicate the transmission from a cell phone, I get these spikes when I combine all the highway lanes. It's kind of like you think of a signal, if the signals line up, you get a spike. It would take a stereo receiver to make it work in a cell phone, so the other key to the invention and the claim is the idea of complex randomization, which will actually eliminate the spike or greatly reduce it, so that I can use a low-cost linear amplifier in a cell phone. So I can get multi-code spreading in a cell phone. So you've cited all that language. Where's complex multiplier? Well, so in the transforms that are identified as part of the figure for embodiment, you will see that, let me pull out the column, you will see at the bottom of column four up to the first portion of column five, you'll see a number of transforms with the exception of one. They're all orthogonal spreading transforms that do the multi-code. The only transform for randomization is the randomizer transform illustrated in figure eight. So the corresponding structure identified the description of figure four and that it must include the transforms in figure three, and those are all identified here in the portion that I've identified. And both experts agreed at trial that, in fact, the complex randomizer was the only structure, the figure eight structure disclosed in the patent, and that it was part of the corresponding structure, and that's important. The expert didn't say it wasn't in the construction. He said it was part of the corresponding structure, their own expert. And so for the reasons I just identified, I cited passages. So that antedates the construction. Say that again? That expert agreement that you argue antedates the construction, the original construction, right? So it's not in the construction that the court does. Well, it is. The expert agreed that the cited portions from the patent itself, the cited portions from the patent taught that the transforms can be used. I'm not following. You speak very fast. So there's nothing in figure one or figure four that actually requires complex numbers. You're getting me to the specification. Right, and so if I go to column two. So at the bottom of page four it says preferred embodiments, right? Is that where you were reading from? Am I reading from the right place? Column two of the patent? Well, you directed us to column four earlier. Well, just to go through it one more time, if you look at figure four, you'll see there are a series of. No, I've got figure four, but you have to admit there's nothing in figure four that says complex numbers. That is correct. However, there are cited portions from the patent that go along with figure four so you know what the end point transforms are. You wouldn't know what any of the transforms are, whether it's the randomizer transform that does randomization or which spreading transforms to use unless you went to the cited patent. So in column two we say figure four is this schematic showing and then there's a bunch of stuff. Is there something in there that says it has to have complex numbers? So figure four is a drawing that uses the codes generated in figure three. When you go to the discussion in the patent at the bottom of column four through the top of column five, you'll see it says the examples of the transforms. Can you stop? This is where you're speaking too fast and I can't follow it. That's where it says preferred embodiments. Is that where you're reading from? The language of the preferred embodiment? Correct. And then it says examples of the end point transforms in figure three are a bunch of words that are all kinds of different transforms. Except for one, which is the randomizer transform of figure eight. That is the only transform that does complex randomization. But a bunch of these don't require complex. Say again? A bunch of these don't require complex numbers. Well, there are two steps, right? There's the spreading step and the randomization step. The spreading uses any one of the other transforms. The experts agree those are spreading transforms, multi-code spreading transforms. And the only transform in the patent identified, both experts agree, is the randomizer transform of figure eight. And that's what's identified here. So one of ordinary skill in the art would understand reading this, that this is teaching you here are your options for your spreading transforms. That's your modulation of your data symbols. And here is the option for your complex randomization. The randomizer transform in figure eight. And those are the two pieces of the invention. Spreading to modulate. I'm sorry. Sure. This is hard, but when it says examples of the end point transforms in figure three, maybe I should look at figure three, because you're talking about figure four. Is that the same thing as figure? Well, so just so you guys, so that you understand. Because I understand. I have figure four in front of me. And that's what I've been looking at, because that's what you all cite. That has a number of transforms in it. It has up to as many as you want. But then it doesn't say that any of those have to be complex. Well, we're dealing with means plus function terms. And so you go to the patent to see what structures perform the function. What's necessary to performing the function. The only structure identified that does randomizing is descriptively called the randomizer transform of figure eight. And so it's clearly linked to the function. In the patent, it's clearly linked to the function of randomizing the figure eight structure. And I think where the confusion lies. Are you saying that none of these other transforms do randomizing either? Correct. And both experts agree. I thought that one of the, the spreading itself is randomizing. I mean, the use of pseudorandom code is a randomization. The pseudorandom code is not complex randomization. That is distinct. Well, you're, I mean, you're not answering the question. You're presuming the answer that it requires complex randomization. But it seems to me that I don't know what any of these formulas do. But I do know what pseudorandom code is to a certain extent. And that is a form of randomization, is it not? It is, but not complex randomization. So figure eight does complex randomization. And you need the complex randomization to get the spikes out of the signal so you can put it into a cellular device. This is the patent with respect to figure three. That's what we're looking at. Saying that any other reversible transform is, is, can apply. It doesn't say that it must be a complex multiplier. Well, so that's where, you know, a patent is viewed through the eyes of one of ordinary skill in the art. And both experts agree that one of ordinary skill in the art reading this patent. Can you put me in a specific line for this specification that you think requires complex transformation, complex randomization? If you go to, if you go to column five. Yep. If you go to line three. I'm sorry, line two. It says a randomizer transform is the one illustrated in figure eight. And if you go to figure eight, the structure of figure eight. While it doesn't say the words complex randomization. Wait, but. One of ordinary skill in the art. Okay, I get, I get your argument. I agree. Figure eight is a random, is a complex transformation. Correct. But this says, for examples of the endpoint transforms in figure three. A whole list. It doesn't require a randomizer transform. It requires one of these or one or more of these whole list. So why isn't the use of one or more of these and not the randomizer transform in figure eight sufficient structure? Because this is where, you know, patents are looked through the eyes of one of ordinary skill in the art. Each expert agree that the randomizer transform was the only structure disclosed in the patent for meeting the function. Remember, I have to link to the function. I've got to spread and I have to have to randomize. The randomizing function is achieved. Both experts agreed by the complex randomizer and figure eight. And while there's a list, one of ordinary skill in the art. And they both agreed would understand that is the transform for randomizing to meet the function in the claim. But the other transforms are also understood to be spreading transforms. That's first I take my data symbols and I put them on different highway lanes. I spread them on highway lanes using one of these transform. Then I combine. That would be a reasonable reading if what it says was examples of the spreading things are this whole list. And then examples of the randomizing are this list. But what it says, examples of the end point transforms in figure three are any of this list. Well, the literal language is as you described, Your Honor. I will agree. To add to that, it goes back to we're looking at the language in lines one, two, three, and four of column five. And I pointed you to line six. This is in any other reversible transform. So it's speaking about reversible transforms. It gives you a list, but nowhere does it talk about a complex transform. Well, the randomizer transform in figure eight that's identified is one of the examples. One of the transforms you can use actually is the complex randomizer. Both experts agreed. While there's a list. Can I pull back a little bit? Sure. Let's just assume that we disagree with you on the claim construction. It seems like the district court actually did. I don't know. I didn't follow it very well and I didn't find the reasoning particularly persuasive, but relied at least in part on expert testimony to get to that claim construction. So even if we disagree, is that something that presents a tether issue for us about deference? I don't believe so. You mean the... So if we think the claim construction is wrong, we can just reverse it and send it back. If you think the claim construction is wrong, you could. Correct. You could do that. The claim construction based on what the experts is right... I'm sorry. Maybe I'm not being clear. I think you're answering the question adverse to your interest, but I see this as a disputed claim construction issue that was at least in part relied... The district court relied upon expert testimony to reach his claim construction. Under TEVA, aren't we required to defer to that claim construction since it's based upon extrinsic evidence? Yes, Your Honor. Okay. So it does seem to me a little bit problematic, the claim construction. Even if that's the case, though... Well, you know what? We've taken up too much of your time on this issue. Do you want to move on to something else? I think the theme here today is that intellectual property trials should be about an intellectual property right as the court has defined it. And then the jury should ask the question, is that intellectual property right found in the accused product? In this particular case, the district court erred in not enforcing its claim constructions. At trial, Apple urged two limitations that are not found in the court's claim construction. Well, it seems to me you're arguing one way on one claim construction and one way on the other one. On one claim construction, you say not enforcing it more explicitly. And then on the other one that goes in your favor, you're saying he can add in additional language after the fact. But the difference is on the complex multiplier, both experts agreed that it was part of the corresponding structure explicitly. And in this case, we don't agree. Was that claim construction ever presented to the jury? The complex multiplier? Yes, absolutely. Was it part of the jury instructions? Well, the figure one and four embodiments plus the description... Well, not the embodiments and the specification. The district court made a specific claim construction on this disputed claim language, didn't it? And it didn't use the words complex multiplier. He added that in on his JMAL. He said it wasn't explicitly stated to be a complex multiplier. But I don't believe that he said... He pointed to the fact that both experts agreed that the corresponding structure included the complex multiplier. And both experts agreed that what was stated in the court's construction, at least on cross of their expert, he agreed as well that it was included within the transforms identified that the corresponding structure linked to the transform. So if the jury was making its factual findings on invalidity, was it explicitly aware that it had to find prior art that it had a complex multiplier? Yes. Where in the record? It would have been explained to the jury as part of the trial as well as the closing arguments by both sides that the claim requires the corresponding structure required a complex multiplier. So they were well aware. Before you sit down, I'd like to hear some argument on the sequencing of the modulated data symbols. Can you address that, please? Yes. So we're dealing with means plus function language, means to combine modulated data symbols. And the court below found that the modulated data symbols need only be spread. And so taking the court's construction as it was given, there's no question and there's no dispute that Apple's products combine modulated data symbols. The question is, should... The error that occurred was the court did not enforce its construction before the jury or on JMAL. And had it, there'd be no question that a sequence is not required. And the sequence is, does the modulated data symbols, the means to combine the modulated data symbols, have to happen last? It does not if modulated data symbols mean spread data symbols as the court construed the term. The patent reads and combines the modulated data symbols. What does the refer to? It refers back to the modulated data symbols in the first computing means. Doesn't that require a certain sequence? It does not because we're dealing with means plus function claims. And the means, the first computing means, if you look at figure four, has a stage where you modulate and a stage where you randomize. Two endpoint transforms. The experts agree, the Qualcomm prior art, the Gilhausen prior art, and the Qualcomm chip specifications, which talk about how the product works. Everybody agreed, both experts, that how you order the combining of the modulated data symbols, whether or not you do it at the end, after the computing means has done its modulating or spreading and done its randomizing, or whether you include the means to combine within the modulation and between the modulation and the randomization within the first computing means. Either order gives you the exact same output. And so when we look at means plus function claims, we ask, what structure is necessary for performing the function? It's a necessary test. And if both experts agree that it's not necessary to have the means to combine last, and that it can occur between the modulator and the randomizer within the first computing means, then you would not read a requirement of a sequence into these means plus function claims. OK, I think I got it. Any other questions? All right, thank you very much. Mr. Davies, you're reserving two minutes for your cross-appeal. Is that correct? I'm at your service, Your Honor. If we're going to talk about validity in this argument, then we can do it all now. I'm going to add two minutes to your 13 minutes. I'm here for you, Your Honor. You may proceed. Can I start with my Teva question? Yes. Because I think, honestly, that I have some big problems with the district court's construction, but it also seems to me that he did rely on expert testimony, so I'm not sure that I can do anything about it. Setting aside the question of whether this was presented to the jury, which I don't see that it was, so it needs to go back, but it seems to me that we can't reverse the district court's construction outright, because we have to defer to its factual findings of what a person of the ordinary skill would find, unless we find them clearly erroneous. Happily, there is actually a clear answer on that, Your Honor, is that it was not a claim construction. What the district court did was cited expert testimony, but never keyed that testimony to a particular term. There is no construction that you have to defer to under Teva. That would be the straightforward answer, because he used the word complex multiplier. He cited our expert, but he never keyed it back to the terms in the patent. So there was not a Teva issue, because it's not a claim construction issue. But beyond that, you can't have an expert come in and just start adding words to patents. That's not what the public relies on. It relies on what's in the patent. So I guess you could also go off the clearly erroneous rationale as well. I mean, there is no complex multiplier as you started. There's no complex multiplier required in the patent. And that's what the district court started out by saying. That's at Appendix 73. Everybody agreed there was no complex multiplier in the patent. The jury was never told. The jury instructions are 8th Appendix 3377, Your Honor. Our expert at 1033 makes it clear that there is no complex multiplier required. Claim 8, I think, would also help Your Honor's understanding. There is no complex multiplier required. The only reason the district court got there was our expert testimony, which we think was misunderstood, and I can elaborate on that. But Teva itself, if Teva stands for anything, it certainly stands for a wide swath of reading the patent itself. And I think you could really stop and end there. I have many, many more things to say, but the sequencing argument, Your Honor, I think is one of, I was re-reading your Motorola decision, and it's really very directly on point here. At Appendix 1026, our expert told the jury, the language of the claim itself tells us it's an order. First you randomize, and then you combine. And that just follows naturally from the reading of the claims, very similar to the Apple Motorola case. It's confirmed by the figures, and the Oak Tech case is also directly on point. So that's the sequencing rationale. We have the validity that we've been over, and there is this complex multiplier issue that I'm happy to answer questions on as well. Can I ask you about the sequencing issue? So to the extent I understand your friend's argument, it is that even though the structure may have, and the claims may have a certain sequence, it's not necessary to the invention, so they can get there through the doctrine of equivalence. So that seems like a very odd argument to me, when we're in the means plus function world, because the means plus function world means you have to provide the specific structure. So how could you have a doctrine of equivalence for a structure that's different than the structure and the patent? Yeah, you could not. And obviously it would be a jury call. To the extent you would make the argument, it would be a jury call. And here we have the briefing. We didn't get a final brief, so the briefing's a little unclear on this, but the actual exchange in the record at 1054 is, their suggestion is, well, the 300 million transistors, there's a little bit of a change of 20, so that doesn't really matter. But our expert comes right back, tells the jury, no, that's a big deal in our universe, that that's actually a 10% optimization of the particular sections that a team's in charge of. And that, if anything, is a jury call, Your Honor. So if there's anything to defer to, I don't think it's a tavern point, it's this doctrine of equivalence finding by the jury expressly rejecting their doctrine of equivalence argument. So recall, we have a jury verdict. This is not, we're not up on anything unusual. We have a jury that sat for a week, eight people, they heard the arguments and they made a decision, and this court is rightfully respectful of that process. And it's not one, not two, but three reasons to uphold that verdict. There is the validity issue, which I think is... I'm here for you, Your Honor, so I'm happy to answer further questions. Do you want to go over there quickly? Well, so here's what I'm stumped as to what to do on this. Because the validity thing seems to me like, even though you say it's not a new claim construction, it seems to me that at least it's implicitly a new claim construction by saying the patent requires a complex number randomizer. So, and that, you know, I assume you disagree with your friend that that was presented to the jury. Well, you can read the... Yeah, no, no, I'm... Let's assume the jury did not know about this requirement. It should, at the very least, it should come back. I assume you want us to reinstate the invalidity thing, but I'm having a little trouble getting around the fact that the district court found that the patent actually did include this. And so... So I'm happy to speak to that again, Your Honor. And this court obviously sees this issue time and time again, right? A party goes to trial on one set of claim constructions, doesn't get the answer, and all of a sudden, oh, I've got a new claim construction. Oh, it's not new, but it's come up before. There are loads of cases on the topic. So you're not inventing... It's not the first time this court... It's not a novel problem. And we cited them. There's HB, there's Salovey, there's Moba, there's Cordis. And they really all come down to whether the claim construction was presented and whether it makes sense. But are there any that meet these facts? I can understand where a claim construction is presented to the jury. They argue, and the jury finds invalidity. On a JMAL motion, they argue a new claim construction, and the district court says, no, that's a new claim construction, and we affirm. But that makes sense. Are there any situations where the district court says that this new claim construction actually should apply, and therefore I'm going to flip the invalidity decision? And we go back and say, no, you can't do that, rather than just vacate and remand? Yeah, I think the HP and I think Salovey are in that procedural posture. But the logic would be the same regardless. It would be an unfortunate outcome if that tactic would work here. Well, I understand that, but isn't the district court free if even after a jury trial of invalidity, somebody comes in and says, you know, you really got your claim construction wrong. You should change it. He's not bound. He could say, I agree with you. If he does, what he should do is send it back to the jury. But the jury's already ruled. Under what he now thinks is an incorrect legal claim construction. Well, but litigation has a sequence. It has a sequence. And the reason why Markman comes in the process when it does is it doesn't come after the jury rules. There's no, like, post-trial, post-jury Markman. That is just not the system we have, and it would be unfortunate. This is a heavily litigated patent. It really is. We've upheld a district court where the district court goes back and clarifies the construction. Sure, sure, that happens. That's a clarification. Exactly. And in our cases, we say that's okay because the clarification itself was minor to the point that the jury understood both sides and understood what's being sought now. But is this a clarification in this case? Isn't this a real game-changer to suddenly come back and add the complex randomizer into the construction? And that's where this argument began. A game-changer, it's a U-turn, or whatever metaphors we want to use, Your Honor. At A73, there's an agreement by the parties that the definition of the old one does not include the complex multiplier, but... Was there a basis for the jury to not accept what is characterized as the agreement of the two experts? Was there a factual basis? Could they have disbelieved them? Thank you, Your Honor, yes. Our expert certainly said things that the jury could have credited. So even if our expert had said what had been mischaracterized as adding the complex multiplier. For example, at 1059, he says, the court's claim construction told us what the first computing means is, and it didn't say complex multiplier. So the jury could have just said, yes, I'll believe that part of the testimony. In Appendix 1074, the prior art, which all agrees has no complex multiplier, 1074, our expert says the prior art still invalidates. So there's plenty of testimony for the jury to resolve, and he's contradicting himself. Plenty of expert testimony for the jury to... And that's what, I mean, that's really what you should be deferring to. What role does the construction in the Acer case have in this case? I mean, doctrinally, I don't think it has anything to do with it. It's a separate case. But I think in terms of this court understanding the real-world dynamics of a party that advances arguments in one setting and elects not to argue them in another setting, I think it's useful background. And obviously, the judge there made some decisions that were well thought through, and they're instructive, but they're not minding it. Was this ever argued before the court? One more time. Was the Acer construction ever brought up? I didn't get up to this point. So I'll close with... I have a few more minutes, and I do think the tech is worth trying to understand because we all spend a lot of time on it, and it took me a little while to really understand the way it works, which is this, that each data symbol that is transmitted has to get its own unique code. If you get that, then a lot of things follow from that. And the reason why each data symbol has to get a unique randomizing code is because they're being transmitted at the same time. So to decode them when they're all sent at the same time, they each have to have their own unique code, or you can't unpack it. Once you know that, once you know that each data symbol that's transmitted at the same time has to get its unique code, then they have to be on separate paths. And once they're on separate paths, and N is the same number of data symbols as paths, then you know there's only one symbol at a time, and that's what Figure 1 shows in more detail. And that's the N argument. But that's a lot. But the first issue, because a lot of technical terms, it actually comes down to a very simple question, which is this. The jury had the claim construction of N. N equals the number of parallel data symbols. Then you go to the example 2, which is at page 43 of our red brief, and it's just a picture. And it's a picture of three yellow dots. And all the jury had to say is, are those three yellow dots in parallel or not? And they're not. If you look at the three dots, they're two are serial, and it's page 43. I got it right. So it's page 50 of the blue brief or page 43 of the red brief. The only question the jury was asked is whether those two yellow dots and the one dot below are in parallel. The top two are serial and the bottom one is kind of in the middle. The streams may be in parallel, but the data symbols, which the jury was told was the construction, the data symbols have to be in parallel. The jury just looked at that and said, well, you know, I don't think so. And this court doesn't even have to agree with the jury. They just have to say that was a reasonable determination. And if you actually start to unpack the patent, if you go to figure one, you'll see that there are separate symbols. If you go to the background section, more than one code at the same time, and the whole point, and this is a column two, line 16, is you're going to get these low-complexity parallel operations. So that's the heart of the technical explanation. But the jury result that this court's reviewing is simply whether N equals parallel data symbols can match up with the example two, which at 1027 is what our expert told the jury. Example two does not comply with this court's claims instruction. I'm here for you, Your Honor. Any other questions? No questions, thank you. Thank you. Turning to the converter construction, the court, and you can see this on pages 16 and 17 of our opening brief, we show the constructions proposed by Apple for the term converter. On page 16, we show the constructions proposed by Apple for the function of the converter for converting the first stream of data symbols into plural sets of N data symbols each. So pages 16 and 17. In both the converter construction on page 16 and both the converting function on page 17, you'll see that Apple proposed what is equivalent to an even distribution of the symbols on the output of the converter. If you look at the claim language, the claim language only requires that a converter convert the incoming stream of symbols into plural sets of N data symbols each. The court construed that as even separation of the incoming stream into groups. Three at a time, four at a time, that's N data symbols each. Each group has to have the same number. So even separation of the incoming stream and the language of the claim does not speak to how the data symbols need to be output because it's not important to the invention. The invention's about having two or more parallel streams of data symbols and how many symbols from each group you distribute on those parallel paths is not important to the invention. The invention's turning a single lane highway because you're gonna mine all these lanes together and transmit them as one composite signal into a multi-lane freeway because you'll be able to get out those parallel paths on the other end. How many cars or how much traffic, how many symbols you put on any highway is not important to the invention. And so they imposed during trial an addition to the court's construction that was rejected during markment. The court agreed that even separation from the incoming stream was required. You can see that on page 17 of the opening brief. But he rejected and we bolded the language that would then say I need to then separate each group. Once I've evenly separated it from the incoming stream, I've got my group of three symbols. They then tried to add the limitation that you need to then evenly distribute those symbols on the output paths. You will find no language in the claim that calls for anything about how you output those symbols. It's not important to the invention. The invention is about having two or more parallel orthogonal paths, a multi-lane highway. And you can place any number of symbols from the group on the top path, any number on the bottom path. You have three lanes, you can distribute them in any way you would like across the three lanes. It's again creating a multi-lane highway. That's the essence of the invention. And then the complex randomization to get rid of the spikes in the signal that you get when you go to combine these paths for transmission. And that allows for it to work in a cellular device. By getting rid of the spikes, I can use a low-cost linear amplifier. Because now I don't have to replicate this big signal, which would take a big amplifier. And so that's the essence of the converter. Back to just a couple of points that I would like to raise. And that is, you'll find in appendix site A73 that the court included the corresponding structure for the first computing means. And in there you will find the cited passages I took you through that both experts agreed, disclosed that the corresponding structure included the complex multiplier. So you will find that actually set forth in the court's construction on appendix A73, which is page 56 of the JMOL order. Back to the issue of the sequence. The question of whether or not an order is necessary to performing the functions of combining the modulated data symbols and doing the functions of the first computing means, spreading to modulate, create modulated data symbols, followed by the function of randomizing those modulated data symbols, that is a question that goes to the literal scope of the claim. How much of the corresponding structure do I read into the claim's literal scope? So order is not necessary. The experts agreed, it's in the record. The prior art, the Qualcomm prior art, the Gilhausen reference, says that how you order the combining and randomizing structures is not, it gets you the exact same output and it's interchangeable. And then the Qualcomm's data sheets for how their chips work. Say you can reverse the order. You can do the order either combined in between modulating and randomizing or you can combine at the end and you get the exact same result. But it affects the hardware. Right, but that's an equivalence question. Order, under means plus function, we look at is it, I have to decide what's the corresponding structure. And do I have to read in an order to these structures or not is a question of is it necessary. Your law says that you only read in so much of the structure disclosed in the patent as is actually necessary for performing the functions and all experts agree you get the same output. The first computing means will modulate. If you combine, put the combiner within the first computing means, it will combine, it will then randomize and the output will be modulated symbols that now have been randomized. You will get that regardless of where you put the combiner. The first computing means if I put the combiner last, I'll modulate in the first computing means, I'll randomize and then I'll combine. Either order gets me the exact same functional result required by the claim and your law says you only read in that of the structure, the corresponding structure necessary to perform the function. When you move over to equivalence, we never had an opportunity to argue equivalence where we knew what the literal scope of the claim was because the court didn't enforce its Markman ruling which said modulated data symbols didn't have to be randomized. When you get into DOE, that's when you're now into the insubstantial differences test. When you get to that test, that's where differences in hardware matter. Here, the overwhelming evidence was... I'm sure you're out of time. Yeah, sure. I think we have your argument. Thank you very much. You're welcome.